IN THE DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HARVEY STEWART, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CASE NO.: 04-11598-WGY |
| ) | |
| R. JAMES NICHOLS, SECRETARY ) | |
| U.S. DEPARTMENT OF VETERAN ) | |
| AFFAIRS, ) | |
| ) | |
| Defendant. ) | |

# Exhibit 1

1

1 - 95

IN THE UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS


HARVEY STEWART,            )
                           )
        Petitioner,        ) DOCKET NO.
-v-                        ) 04-11598-WGY
                           )
ANTHONY J. PRINCIPI, Secretary )
of United States Department of )
Veterans Affairs,          )
                           )
        Respondent.        )


THE ORAL DEPOSITION OF HARVEY STEWART, held pursuant to Notice, and the applicable provisions of the Federal Rules of Civil Procedure, before Marilyn Franklin, a Court Reporter and Notary Public, within and for the Commonwealth of Massachusetts, at the offices of the United States Attorney, 1 Courthouse Way, Suite 9200, Boston, Massachusetts, on Friday, April 1, 2005, commencing at 10:00 a.m.



*APEX Reporting*
(617) 426-3077

```
 1         program?
 2    A    Yes.
 3    Q    And when was it that you started there?
 4    A    I believe it was August.
 5    Q    Of 1999?
 6    A    Yes.
 7    Q    And what does PATH stand for, if you know?
 8    A    It's psychiatric assistance therapeutic housing.
 9    Q    When you went from the gastrointestinal clinic to the
10         PATH program, psych unit, did your grade stay the same?
11    A    Yes.
12    Q    And did your salary stay the same?
13    A    Yes.
14    Q    How about your position description, did that stay the
15         same?
16    A    No.
17    Q    What was the title that you had when you started in the
18         PATH program?
19    A    You were an advocate.
20    Q    You were an advocate, Mr. Stewart?
21    A    Yes.
22    Q    And is that your job title today?
23    A    That's correct.
24    Q    Now, at any time between approximately August of 1999,
25         when you started as an advocate in the PATH program,
```

and today, has your salary gone down?

A   No.

Q   And presumably it's gone up on some regular basis during that time?

A   According to step raises and COLAs, yes.

Q   How about your grade, what's your current grade?

A   I'm a 6 Step 7.

Q   And at any time since August of 1999. when you started in the PATH program, until today, did your grade or step level ever go down?

A   No.

Q   But your step has gone up within the grade?

A   Yes.

Q   From what to what?

A   6 to a 7. GS-6.6, to a GS-6.7.

Q   And when did it go up to 7?

A   I believe year and a half ago, two years.

Q   What's your current salary, Mr. Stewart?

A   I -- I believe it's basis 39,000.

Q   When you say basis, that means there's potential for overtime?

A   Oh, there's potential for overtime, there's differential.

Q   Differential is shift differential?

A   Yes. Working on odd shifts.

| | | |
|---|---|---|
| 1 | | shifts, et cetera, in the GI unit? |
| 2 | A | I'm sure there was, but I wasn't aware of who, who that |
| 3 | | would be. |
| 4 | Q | It was just posted and you didn't know who was doing |
| 5 | | it? |
| 6 | A | I knew I had to be there 7:30 in the morning till |
| 7 | | 4 o'clock --- |
| 8 | Q | So for that four months you --- |
| 9 | A | --- and work with a nurse. |
| 10 | Q | --- your shift didn't change? |
| 11 | A | No.  Well, it did, I'm sorry.  There were times when we |
| 12 | | would be called up to West Roxbury because of an |
| 13 | | emergency bleed or something like that.  So I would |
| 14 | | have to go up to West Roxbury to whatever time. |
| 15 | Q | And who was it -- if that happened, who was it who |
| 16 | | would say, we need you up in West Roxbury or we don't |
| 17 | | need you, you stay here, we want somebody else to go up |
| 18 | | to West Roxbury for this emergency? |
| 19 | A | Nurse Buttermore, Mary Buttermore.  I worked directly |
| 20 | | under her. |
| 21 | Q | Oh, so she was your supervisor? |
| 22 | A | No. |
| 23 | Q | No? |
| 24 | A | She was the nurse in charge of GI clinic in Brockton. |
| 25 | Q | In your present position, who is your supervisor? |

| | | |
|---|---|---|
| 1 | A | Dr. -- right now? |
| 2 | Q | Yeah, right now who does your performance reviews, say? |
| 3 | A | I believe it's Dr. Gurrera. |
| 4 | Q | When you first got to the PATH program, who was your supervisor? |
| 6 | A | Dr. Swett. |
| 7 | Q | Is that Charles Swett? |
| 8 | A | Chester. |
| 9 | Q | Chester Swett. And it was Dr. Swett who did your performance reviews? |
| 11 | A | Yes. |
| 12 | Q | And was there a, as in the GI unit, was there a lead health tech who did schedules? |
| 14 | A | No. |
| 15 | Q | Who did the schedules in the PATH program when you first got there? |
| 17 | A | Robert Watts. |
| 18 | Q | And is Robert Watts still there? |
| 19 | A | No. |
| 20 | Q | When did he leave? |
| 21 | A | I -- it's within the last two years. |
| 22 | Q | Who does the schedules now? |
| 23 | A | Laurie Amabile. |
| 24 | Q | How do you think you spell Amabile? |
| 25 | A | A-m-a-b-i-l-e. |

|    |   |                                                                      |
|----|---|----------------------------------------------------------------------|
| 1  |   | this isn't right, I haven't refused to take vital                    |
| 2  |   | signs?                                                               |
| 3  | A | Dr. Swett.                                                           |
| 4  | Q | Did he give you the written counseling in person?                    |
| 5  | A | Yes.                                                                 |
| 6  | Q | And did you read it at the time he gave it to you?                   |
| 7  | A | Yes.                                                                 |
| 8  | Q | And was it at that time that you said, well, wait a                  |
| 9  |   | minute, this is wrong, I haven't refused to take vital               |
| 10 |   | signs?                                                               |
| 11 | A | Yes.                                                                 |
| 12 | Q | And what did he say?                                                 |
| 13 | A | I don't recall what he said, something about, that's                 |
| 14 |   | what had been reported to him by Bob Watts, or Robert                |
| 15 |   | Watts.                                                               |
| 16 | Q | Did you tell anyone else that you believed this written              |
| 17 |   | counseling was wrong or inaccurate?                                  |
| 18 | A | Yes.                                                                 |
| 19 | Q | And what was the response?                                           |
| 20 | A | I told the union.                                                    |
| 21 | Q | You told who?                                                        |
| 22 | A | The union.                                                           |
| 23 | Q | The union?                                                           |
| 24 | A | Right.                                                               |
| 25 | Q | Did you actually file a formal grievance?                            |

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | And did it go through the grievance process? |
| 3 | A | Up to the chief of staff. |
| 4 | Q | And what was the outcome of the grievance process? |
| 5 | A | I believe it was there was no basis for that complaint. |
| 6 | Q | No basis for the complaint? |
| 7 | A | Correct. |
| 8 | Q | So it was withdraw or what happens to a written |
| 9 | | counseling if it's grieved and there's a determination |
| 10 | | there wasn't any basis for it? |
| 11 | A | No disciplinary action taken against me. |
| 12 | Q | So it goes away? |
| 13 | A | It's supposed to, yes. |
| 14 | Q | Does a copy of it -- so a copy of it is not in your |
| 15 | | personnel, permanent personnel file; is that correct? |
| 16 | A | Not supposed to be. |
| 17 | Q | You say not supposed to be as if you believe it is |
| 18 | | there? |
| 19 | A | I've seen it there. |
| 20 | Q | It is in -- it is in your file? |
| 21 | A | Yes. |
| 22 | Q | In December of 2001, did you understand that the taking |
| 23 | | of vital signs was part of the job that you were |
| 24 | | holding? |
| 25 | A | No. |

1  Q    At which point was there another face-to-face meeting?
2  A    Yes.
3  Q    And was that Joe Morana again representing you?
4  A    Joe Morana and Ellen Pitts.
5  Q    And Ellen Pitts is?
6  A    The international -- well, I think she's the union's
7       international representative.
8  Q    But she was there also representing you?
9  A    Yes.
10 Q    So you had two union reps, Ellen and Joe, and you?
11 A    Yes.
12 Q    And the chief of staff was who?
13 A    I'm not sure, I believe it was Dr. Miller.
14 Q    And following this Step 3 meeting in -- on your
15      grievance, what was the outcome?
16 A    That were was no basis for the allegations made against
17      me.
18 Q    And that's what Dr. Miller found and ruled,
19      essentially?
20 A    Yeah, he just said, no evidence that I had refused
21      vital signs.
22 Q    And did Dr. Miller put that in a written document?
23 A    Yes.
24 Q    And is that in the -- do you have a copy of that?
25 A    No.

*APEX Reporting*
(617) 426-3077

1  Q  Who would have a copy of that?
2  A  The union.
3        MS. SMITH: Can we get a copy of that, Jen?
4        MS. DAVIS: Oh, I'll work with him and see if we
5  can get that.
6  Q  BY MS. SMITH: But were you given a copy and you just
7  don't have it any more, or?
8  A  No. A copy was sent to the union.
9  Q  By Dr. Miller or whoever the chief of staff was at the
10 time?
11 A  I guess.
12 Q  And they showed it to you, I mean, have you seen it?
13 A  No, I haven't.
14 Q  You've never seen it?
15 A  No.
16 Q  Somebody just told you, hey, here's the outcome?
17 A  Yeah.
18 Q  And do you recall who it was who told you, was it Joe
19 Morana?
20 A  Joe Morana e-mailed me and told me that he had received
21 it and it was resolved and the allegations had been
22 judged unfounded or something like that.
23 Q  And do you have a copy of that e-mail?
24 A  I believe so.
25 Q  So, Joe Morana got a copy of the letter from Dr. Miller

1  or whoever sent it, after the Step 3 meeting with the
2  chief of staff?
3  A  Yes.
4  Q  And he e-mailed you and said, good news ---
5  A  Mm-hm.
6  Q  --- this is what the decision was on the Step 3
7  meeting, which is, that this allegation was unfounded?
8  A  Correct.
9  Q  And then did it say what happens now?
10 A  No.
11 Q  What was your understanding of what if anything was
12    going to happen?
13 A  My understanding was that it would be expunged from my
14    record, that it wouldn't be left in my personnel file.
15 Q  I think I asked you this before, you don't know whether
16    the taking of vital signs ever was approved by or
17    authorized by human resources to become an official
18    part of the health technician's job description?
19 A  No, I don't.
20    MS. SMITH:  I think we're almost done, I'm just
21    going to step out for a moment with my associate here.
22    MS. DAVIS:  Okay.
23    (Off the record from 11:58 a.m. to 12 noon.)
24 Q  BY MS. SMITH:  Just a couple more questions.  And I
25    don't know if we can clarify this or not, but I think

Q  you said earlier that Dr. Swett's name was Chester?

A  I believe so, yes.

Q  In the complaint it says Charles, and I just wondered if you had a sense of which one is more likely right?

A  Chester.

Q  Chester? So this ---

A  Yes.

Q  Okay.

A  The way I know that is they call him Chet.

Q  Which is generally a nickname for Chester ---

A  Chester, yes.

Q  --- not Charles. Okay.

When you apply for jobs within the VA system, in general, what is part of that application? Do you include a resume that you've ---

A  Generally they have a packet.

Q  And the packet includes what?

A  Different forms that are required if you're an employee, because that packet is different than from for someone that's outside.

Q  From the outside?

A  And then they review your personnel record.

Q  So, if you see a posting that you're interested in, you ask for the packet?

A  I ask for the packet.

*APEX Reporting*
(617) 426-3077

| | | |
|---|---|---|
| 1 | A | It's an official document. I said, but this has been |
| 2 | | resolved. And they says, well, it stays in until the |
| 3 | | resolution comes. |
| 4 | Q | And was there a copy of the resolution that Joe --- |
| 5 | A | No. |
| 6 | Q | --- Morana got from -- wait till I finish the question. |
| 7 | A | I'm sorry. |
| 8 | Q | --- that Joe Morana received from the chief of staff |
| 9 | | after the resolution of your Step -- Step 3 of your |
| 10 | | grievance procedure? |
| 11 | A | No, that wasn't there. |
| 12 | Q | And have you asked the union for a copy of that so that |
| 13 | | you could put it in your personnel file? |
| 14 | A | I was trying to get that, there's some difficulty, they |
| 15 | | work days and I work evenings and I'm not always able |
| 16 | | to get off the unit in time before they leave the |
| 17 | | office. So I have never got it. |
| 18 | Q | So, do you recall when it was that Joe Morana sent you |
| 19 | | the e-mail saying --- |
| 20 | A | I don't. |
| 21 | Q | --- hey, Dr. Miller decided in our favor on this? |
| 22 | A | I don't. I don't recall the date. |
| 23 | Q | So you haven't yet asked the union either to give you a |
| 24 | | copy to put in your personnel folder or for them to |
| 25 | | make sure that they got a copy to HR to go in your |

| | | |
|---|---|---|
| 1 | | personnel folder? |
| 2 | A | Say that again? |
| 3 | Q | Have you asked the union to give you a copy of that |
| 4 | | resolution to put in your official personnel file yet? |
| 5 | A | No. I told them I wanted a copy of that. |
| 6 | Q | You told who? |
| 7 | A | Joe Morana. |
| 8 | Q | At what time, when he sent you the e-mail? |
| 9 | A | Yes. Yes. |
| 10 | Q | And you haven't received one yet? |
| 11 | A | No, we haven't coordinated yet. I need to go to the |
| 12 | | union office to get that. I haven't been able to get |
| 13 | | there before the office closes. There's -- he's |
| 14 | | covering West Roxbury, JP and Brockton, and he assured |
| 15 | | me that that would be taken out of it. |
| 16 | Q | Okay. And when was this last -- when was that |
| 17 | | conversation when he assured you that would be taken |
| 18 | | out? |
| 19 | A | I'm not sure. I'm not sure. I would have to look at |
| 20 | | the e-mail, and it would be in that general vicinity. |
| 21 | Q | So in addition to the e-mail, you also had a |
| 22 | | conversation with him about this by phone or in person? |
| 23 | A | I left him a message on his, on his voice mail. |
| 24 | Q | And your message said what? |
| 25 | A | That, you know, I would try and get over and hopefully |

| | | |
|---|---|---|
| 1 | | we could connect so I could get a copy. |
| 2 | Q | And is there a reason that this couldn't be mailed to |
| 3 | | you by Joe Morana? |
| 4 | A | I wouldn't know.  I don't know whether he has to hand |
| 5 | | that to me.  I don't know what the policies are. |
| 6 | Q | Have you asked to have it mailed to you? |
| 7 | A | No, I haven't. |
| 8 | Q | Have you asked to have it, when he's there, put in an |
| 9 | | envelope with your name on it and left with someone in |
| 10 | | the building? |
| 11 | A | No. |
| 12 | Q | Do you have inner-office mail system for employees --- |
| 13 | A | I wouldn't trust that. |
| 14 | Q | Let me finish the question. |
| 15 | A | I'm sorry. |
| 16 | Q | Is there an inner-office mail system for employees and |
| 17 | | staff who work at the VA Medical Center? |
| 18 | A | There is. |
| 19 | Q | And you didn't ask Joe Morana to put this in |
| 20 | | inner-office mail for you to get, because you don't |
| 21 | | trust the inner-office mail; is that --- |
| 22 | A | That's correct.  That's correct. |
| 23 | Q | And I believe you said a minute ago that when you -- |
| 24 | | that Joe Morana assured you that would be taken out, I |
| 25 | | think were your words? |

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | And when you say that, what were you referring to? |
| 3 | A | The --- |
| 4 | Q | The written counseling? |
| 5 | A | --- letter of -- the written counseling, correct. |
| 6 | Q | And when you say taken out, you're referring to your personnel file? |
| 8 | A | It would no longer exist in my personnel file, correct. |
| 9 | Q | So at some point following the Step 3 grievance procedure meeting with you, Joe Morana, Ellen Pitts and the chief of staff, Dr. Miller made a decision on your grievance, wrote something that said, there's no basis for this written counseling, and provided that writing to Joe Morana, but you never got a copy between then and as you sit here today? |
| 16 | A | That was my understanding, yes. |
| 17 | Q | And although Joe Morana assured you he'd make sure that either you or HR got a copy so that the written counseling was taken out of your personnel folder, that yet hasn't happened as far as you know? |
| 21 | A | As far as I know it hasn't. |
| 22 | Q | Okay. And you haven't asked that this be mailed to you so that you could get it to HR? |
| 24 | A | No. |
| 25 | Q | Or that ask Joe Morana to just mail it himself to HR or |

| | | |
|---|---|---|
| 1 | | take it in person himself to HR? |
| 2 | A | My understanding was that that's what he did. |
| 3 | Q | And you just don't know -- you haven't been able to |
| 4 | | confirm whether he did or didn't yet because of this |
| 5 | | schedule difficulty? |
| 6 | A | No.  I -- when I seen it in my personnel file, I |
| 7 | | brought it to his attention, and his statement was, |
| 8 | | it's not supposed to be in your personnel file, it was |
| 9 | | taken out. |
| 10 | Q | But I thought you said there wasn't yet -- that they |
| 11 | | were waiting for a copy of the decision? |
| 12 | A | That's what human resources said to me, that's their -- |
| 13 | | their explanation is, until this -- we receive this, |
| 14 | | it's not taken out. |
| 15 | Q | And you don't remember the name of the person who was |
| 16 | | there that day? |
| 17 | A | That -- the person that sits at their front desk is |
| 18 | | changing all the time. |
| 19 | Q | And did you report that to Joe Morana? |
| 20 | A | Yes. |
| 21 | Q | And did Joe Morana say, well, I gave them a copy or did |
| 22 | | he say, well, I'll make sure they get a copy? |
| 23 | A | He said, that's not supposed to still be in your |
| 24 | | personnel file and I'll check into that. |
| 25 | Q | Okay.  And you don't know whether he has or not because |